UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| AUTUMN DUVALL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:17-cv-04439-JRS-MJD |
| | ) | |
| HEART OF CARDON, LLC, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**Entry on Cross Motions for Partial Summary Judgment and
Defendant Dr. Stephen Moore's Motion for Summary Judgment
(ECF Nos. 59, 62)**

Plaintiff Autumn Duvall alleges that her former employer, Defendant Heart of CarDon, LLC ("Heart of CarDon") and its CEO, Defendant Dr. Stephen Moore, deducted from her wages for a criminal history check, uniform purchases, and her installment-contract purchase of a personal computer in violation of Indiana's wage assignment statute, IND. CODE § 22-2-6-1 *et seq.* Duvall contends that those illegal deductions resulted in Defendants' failure to pay her the "amount due" in violation of Indiana's wage payment statute, IND. CODE § 22-2-5-1 *et seq.*, entitling her to liquidated damages and attorney's fees. Duvall further alleges that the criminal history check deductions resulted in Defendants' failure to pay her overtime wages in violation of the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201 *et seq.*[1] Heart

---

[1] Duvall also alleges FLSA claims for Defendants' failure to pay her wages for time worked off-the-clock. That claim is not at issue in this Entry except as it relates to Dr. Moore's alleged liability as an "employer" under the FLSA.

of CarDon and Duvall each move for partial summary judgment on the wage-deduction claims, Duvall moves for summary judgment on Dr. Moore's FLSA liability, and Dr. Moore moves for summary judgment on all claims.[2]

For the reasons explained below, Duvall's motion (ECF No. 62) is **granted in part**, and she is entitled to summary judgment on the uniform deduction claim. Duvall's motion is otherwise denied. Heart of CarDon's motion (ECF No. 59) is **granted in part**, and it is entitled to summary judgment on the claims arising from the criminal history deductions and the personal computer deduction. Its motion is otherwise denied. Dr. Moore's motion (ECF No. 59) is **granted**, and he is entitled to summary judgment on Duvall's claims.

## I. Background

Heart of CarDon is part of CarDon & Associates, a group of companies owned by Dr. Moore and his family. The various CarDon entities together operate senior living communities throughout Indiana. CarDon & Associates, Inc. is the CarDon entity that provides management and administrative support, while Heart of CarDon employs workers and leases their services to the individual communities. (Iskander Dep. 35:21–36:14.) Dr. Moore is the CEO and President of Heart of CarDon. (Moore Dep. 5:4–8, ECF No. 60-11.)

Duvall worked for Heart of CarDon as an LPN at a starting pay of $18.50 per hour. (Duvall Dep. 41:14–20, ECF No. 60-1; ECF No. 60-2 at 13.) Heart of CarDon

---

[2] When these motions were filed, similar claims by another of Heart of CarDon's former employees, Nikki Vestal, were also at issue. Vestal's claims have since been dismissed by stipulation. (ECF Nos. 69, 70.)

paid Duvall weekly, issuing paychecks nine days after the end of each pay period. (*See* Duvall Dep. Ex. 12, ECF No. 60-2 at 9; ECF No. 60-8 at 1; ECF No. 60-4 at 13–30.)

*A. Criminal History & Uniforms*

In her application to work for Heart of CarDon, Duvall signed an authorization stating, "I authorize Heart of CarDon and Edge Information Management, Inc., a consumer reporting agency, to obtain information from" various sources "relating to my past activities, to supply any and all information concerning my background." (Duvall Dep. 35:3–25; *id.* Ex. 4, ECF No. 60-2 at 4.) Heart of CarDon's employee handbook states that the "[a]pplicable fees for obtaining the criminal history check are at the employee's expense and are due at the time of hire either in cash or by authorized paycheck deduction. This fee will be a minimum of $40.00." (ECF No. 63-5 at 30.)

Upon beginning her employment with Heart of CarDon, Duvall signed a wage assignment form. The top portion of the form contains two paragraphs, one relating to the cost of criminal history and the other relating to uniforms. The form states:

> Limited Criminal History Checks
>
> Long Term Care facilities are required by law to check the limited criminal history of all associates. The cost for obtaining this information is currently $27.50 and at the associate's expense. It is due at the time of hire or can be deducted from the first two paychecks. If Heart of CarDon (the Company) pays the amount of the fee on behalf of the associate, the Company considers this a loan and will expect repayment by either direct payment or paycheck deduction. To authorize the deduction from the paycheck, the associate must sign the statement below.

(Duvall Dep. Ex. 15, ECF No. 60-2 at 12.)

The next paragraph addresses uniforms:

Uniforms

Each associate of The Heart of CarDon (the Company) may be required to wear certain uniforms. The Company will pay for uniforms ordered from our vendor and treat this as a loan to the associate. The Company will expect reimbursement from the associate either by direct payment or paycheck deduction. The associate will sign the uniform order receipt as agreement of the merchandise received and the amount of cost.

(*Id.*)

Directly below, there are two further paragraphs, one addressing paycheck deductions for criminal history checks and the other addressing paycheck deductions for uniform purchases, with a signature line under each paragraph.

ASSIGNMENT OF WAGES CONSENT

Limited Criminal History Check:

I hereby authorize the Company to deduct, from my paycheck, the full amount of the cost of a limited criminal history check. If my employment is terminated for any reason and the full amount of the charge is unpaid, I authorize the deduction of the total remainder from my final paycheck. Should my final paycheck be insufficient to cover this fee, I will pay the Company the outstanding balance within 10 days or agree that the Company may pursue any and all other legal remedies to cover my debt. If this action occurs, I will be responsible for payment of the attorney's fees and other costs incurred as a result of a successful legal action against me. I understand that this assignment of wages is revocable by me at any time upon ten (10) days' written notice to the Company.

(*Id.*) Duvall signed and dated the wage assignment consent for limited criminal history checks. (*Id.*) Below reads:

Uniforms:

I hereby authorize the Company to deduct, from my paycheck, the cost of uniforms purchased from the Company's vendor. If my employment

4

is terminated for any reason prior to my having fully repaid this loan amount, I authorize the Company to deduct from my final paycheck any outstanding loan amount needed to reimburse the Company for the cost of uniforms that I have purchased. Should my final paycheck be insufficient to cover this fee, I will pay the Facility the outstanding balance within 10 days or agree that the Facility may pursue any and all other legal remedies to recover my debt. If this action occurs, I will be responsible for payment of the attorney's fees and other costs incurred as a result of a successful legal action against me. I understand that this assignment of wages is revocable by me at any time upon ten (10) days' written notice to the Company.

(*Id.*) Duvall likewise signed and dated the wage assignment consent for uniforms. (*Id.*)

Edge Information Management Inc. ("Edge") conducted a criminal history check on Duvall, charging $27.50 to search data from Indiana, other states, and certain federal agencies, and CarDon & Associates Inc. Accounts Payable paid Edge for the service on Heart of CarDon's behalf. (Iskander Decl. ¶ 7; *id.* Ex. 2, ECF No. 60-12 at 6–10.) CarDon deducted $13.75 from each of Duvall's first two paychecks for the criminal history check. (Duvall Dep. Ex. 25, ECF No. 60-2 at 14–15.)

Heart of CarDon required employees to wear royal blue or navy blue scrubs. (Duvall Dep. 273:25–274:14.) Heart of CarDon did not require employees to wear scrubs bearing any company-specific logo or markings; nor did Heart of CarDon require employees to purchase scrubs from any particular vendor. (Duvall Dep. 274:15–22.) Heart of CarDon associated with Uniform House, a vendor, to make Uniform House's mobile "Scrub Truck" available for employees to purchase scrubs. (Iskander Decl. ¶ 8; Duvall Dep. 274:23–276:11.) Employees would select scrubs from the Scrub Truck, then sign the receipt and return it to Heart of CarDon for payment through

paycheck deduction. Over the course of Duvall's employment, Heart of CarDon deducted from Duvall's paycheck for scrubs purchases on eight occasions for a total of $581.76. Those deductions exceeded 5% of Duvall's disposable earnings for the week on each occasion, with the excess deductions totaling $272.78.

Duvall never attempted to revoke the assignments. (Duvall Dep. 118:18–20.)

*B. Purchasing Power*

Heart of CarDon contracted with Purchasing Power to allow employees to purchase consumer goods through installment contracts and payroll deductions. (Iskander Dep. II 52:8–24, ECF No. 60-9; *id.*, Ex. 73, ECF No. 60-10.) Duvall purchased an Apple MacBook through Purchasing Power for $1,654.23, payable in 52 weekly installments deducted from her paycheck. (Duvall Dep. 292:20–293:4; *id.*, Ex. 75, ECF No. 60-4.) Duvall's contract with Purchasing Power states:

> **Authorization of Payroll Deduction/Revocation.** You voluntarily authorize and direct your employer to take payroll deductions from your paychecks in accordance with the payment schedule disclosed in the **FEDERAL TRUTH-IN-LENDING DISCLOSURES**, and each payment in the payment schedule in the **FEDERAL TRUTH-IN-LENDING DISCLOSURES** will be paid to Purchasing Power. You may revoke the authorization for payroll deductions at any time and remain responsible for making payments for any outstanding balance via Backup Payment Method until paid in full.

(Duvall Dep., Ex. 75 at 5, ECF No. 60-4.) An "Agreement for Payroll Deduction Purchase Plan" between Heart of CarDon and Purchasing Power provides:

> PAYROLL DEDUCTION. Employer agrees to honor and administer all requests from Employees ("Participant") for periodic payroll deductions for the payment of purchases as specified by Participant, whether the request comes from Employee directly or through a designated administrator/agent.

(Iskander Dep. Vol. II, Ex. 73, ECF No. 60-10 at 13.)

Purchasing Power provided electronic notification of Duvall's wage assignment to Heart of CarDon on October 26, 2017. (Iskander Decl. ¶ 12; *id.*, Ex. 4.) The assignment resulted in a single deduction of $31.82 from Duvall's paycheck before she resigned from her employment with Heart of CarDon. (Iskander Dep. II 34:15–35:3, 54:3–8, ECF No. 60-9; *id.*, Ex. 72, ECF No. 60-10; Iskander Decl. ¶ 15, ECF No. 60-12.)

## II. Legal Standard

*A. Summary Judgment*

Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the district court "must construe all the facts and reasonable inferences in the light most favorable to the nonmoving party." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017). All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), but the district court must also view the evidence "through the prism of the substantive evidentiary burden," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). Where, as here, the parties file cross-motions for summary judgment, courts "construe all inferences in favor of the party against whom the motion under consideration is made." *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 561–62 (7th

Cir. 2002). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment should be granted. *Matsushita*, 475 U.S. at 587.

## B. Evidentiary Issues

The parties' dispute over various purported admissions made at Heart of CarDon's Rule 30(b)(6) deposition creates the appearance of disputed facts, but whether Heart of CarDon's statements and conduct constitute "admissions" is a question of law, and whether to deem a matter admitted is within the Court's discretion. *See McCaskill v. SCI Mgmt. Corp.*, 298 F.3d 677, 682 (7th Cir. 2002) ("even if the statement satisfied all of the above criteria, it would not bind this court because the court has the discretion to consider the issue despite the judicial admission"). Admissions come in two varieties: judicial admissions and evidentiary admissions. *See, e.g.*, *Higgins v. Mississippi*, 217 F.3d 951, 954–55 (7th Cir. 2000); *Keller v. United States*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995). Judicial admissions are "formal concessions in the pleadings, or stipulations by a party or its counsel," which are "not evidence at all but rather have the effect of withdrawing a fact from contention." *Keller*, 58 F.3d at 1198 n.8. Evidentiary admissions, on the other hand, "may be controverted or explained by the party." *Id.* The purported admissions here occurred in deposition testimony. "When a party testifying at trial or during a deposition admits a fact which is adverse to his claim or defense, it is generally preferable to treat that testimony as solely an evidentiary admission." *Id.* Thus, Heart of CarDon's statements are, at most, merely evidentiary admissions.

And on closer inspection, those purported admissions are disputed only to the extent that they assume legal conclusions. Duvall contends that Heart of CarDon admitted that it made no loan of any kind to Duvall. (Pl.'s Br. 27) The record reflects that Heart of CarDon's representative testified that Heart of CarDon did not make payment directly to Duvall to pay for the criminal history check and that it did not directly pay Edge on Duvall's behalf for the criminal history check. These facts are undisputed. But Duvall's contention that Heart of CarDon made no loan of any kind is a legal conclusion that Duvall draws from those facts—a conclusion that Heart of CarDon disputes. *See McCaskill*, 298 F.3d at 682 ("The statement at oral argument in this case was similarly a statement of legal opinion, not a stipulation of fact. As such, it is not a judicial admission binding on the appellee, and certainly is not binding on this court.").

Similarly, Duvall contends that Heart of CarDon admitted that "no wage assignment existed at all" for the Purchasing Power deduction. (Pl.'s Br. 33.) The record reflects that there was no agreement between Heart of CarDon and Duvall for the Purchasing Power deduction. But Duvall's contention that no wage assignment existed at all assumes that a wage assignment must be between employer and employee—an assumption that Heart of CarDon, again, disputes. *See id.*

Other purported admissions concern the existence of certain documents and appear to have arisen from a discovery dispute over the relative scopes of Rule 34 and Rule 45. Defendants objected to Duvall's attempt to short circuit Rule 34's thirty-day timeframe for document requests by issuing subpoenas duces tecum to Defendants

for their Rule 30(b)(6) depositions.  Accordingly, Heart of CarDon and CarDon & Associates did not produce certain documents at their Rule 30(b)(6) depositions, though Defendants' counsel agreed to (and evidently did) produce the requested documents in accordance with Rule 34's timeframe.  *See* Fed R. Civ. P. 30(b)(2) ("If a subpoena duces tecum is to be served on the deponent, the materials designated for production, as set out in the subpoena, must be listed in the notice or in the attachment.  The notice to a party deponent may be accompanied by a request under Rule 34 to produce documents and tangible things at the deposition.").  Duvall contends that the failure to produce the documents at the deposition constitutes an admission that no such documents exist.  But Defendants made a reasonable objection, the parties did not seek the Court's intervention in that dispute, and no motion to strike is now pending.  Accordingly, the Court has reviewed all documents in the summary-judgment record without regard to any purported admission that certain documents do not exist.

## III.  Discussion

Indiana's wage payment statute provides that employers "shall pay each employee at least semimonthly or biweekly, if requested, the amount due the employee," and "[a]ny contract in violation of this subsection is void."  IND. CODE § 22-2-5-1.  Indiana's wage assignment statute provides that "[a]ny direction given by an employee to an employer to make a deduction from the wages to be earned by said employee, after direction is given, shall constitute an assignment of the wages of said employee."  IND. CODE § 22-2-6-1.  But such an assignment is valid only if it is (1) in writing; (2) signed by the employee personally; (3) by its terms revocable at any time by the employee

upon written notice to the employer; (4) agreed to in writing by the employer; and (5) delivered to the employer within ten days after execution. *Id.* § 22-2-6-2(a). And even if all the form and content requirements are met, the assignment is valid only if it is made for one of the purposes expressly authorized by the statute. *Id.* § 22-2-6-2(b).

Duvall contends that Defendants' deductions for her criminal history check, uniforms, and purchase of a personal computer from a third party on an installment contract were invalid under the wage assignment statute, and that Defendants therefore failed to pay her "the amount due" as required by the wage payment statute. Defendants respond that the wage assignment forms substantially complied with the form, content, and purpose requirements of the wage assignment statute.

### A. *Criminal History & Uniforms*

#### 1. Form & Content – IND. CODE § 22-2-6-2(a)

Duvall first contends that the wage assignments for the criminal history check and uniform deductions were invalid because they failed to satisfy the form and content requirements of § 22-2-6-2(a). Although the wage assignments are in writing and signed by Duvall personally, Duvall contends that the wage assignments are invalid because they state that they are revocable by Duvall "at any time upon ten (10) days' written notice" instead of simply "at any time upon written notice." (Pl.'s Br. 23–26.) Defendants respond that "the notice requirement does not restrict the employee's ability to revoke the wage assignment 'at any time'," but instead "merely requires that the employee give reasonable notice of the revocation so that the company will have time to cancel the deduction before the next payroll." (Defs.' Br. 15.) Defendants further argue, citing evidence in the record, that the notice is necessary

"because the pay period ends nine days before payday" and "because payroll is typically completed five or six days before payday[.]" (*Id.*) Defendants also note that Duvall never attempted to revoke the wage assignments. (*Id.*)

The first issue, then, is whether the parties' agreed-upon, ten-day notice period violates the statute's requirement that wage assignments be "revocable at any time." Whether the wage assignments' provisions complied with Indiana's wage assignment statute is, of course, a question of Indiana law. In determining issues of state law, federal courts apply the relevant decisions of the state's highest court and, if a question has not been resolved by that court, make a so-called "*Erie* guess"—a prediction of how the state's highest court would rule—based on the decisions of the state's intermediate courts.[3] *Cmty. Bank of Trenton v. Schnuck Mkts., Inc.*, 887 F.3d 803, 811–12 (7th Cir. 2018) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)).

There are no Indiana Supreme Court decisions applying § 22-2-6-2, so its interpretation here requires an *Erie* guess. Although several Indiana Court of Appeals cases have applied the statute, none deal with the provisions or issues presented in this case. *See, e.g.*, *GPHE Holdings, LLC v. Huxley*, 69 N.E.3d 513, 519–20 (Ind. Ct. App. 2017) (holding deductions invalid where employer failed to present any argument or evidence to support their validity); *E & L Rental Equip., Inc. v. Bresland*, 782 N.E.2d 1068, 1071 (Ind. Ct. App. 2003) (holding deductions invalid where employer had no written assignment and identified no purpose authorized by statute); *Cox v.*

---

[3] "While *Erie* questions arise most frequently in diversity cases, the Supreme Court has made clear that the doctrine applies equally to state law claims like [the plaintiff's] that are brought to the federal courts through supplemental jurisdiction under 28 U.S.C. § 1367." *Houben v. Telular Corp.*, 309 F.3d 1028, 1032 (7th Cir. 2002) (citing *Felder v. Casey*, 487 U.S. 131, 151 (1988)).

*Town of Rome City*, 764 N.E.2d 242, 250 (Ind. Ct. App. 2002) (holding deduction for insurance premium invalid in absence of writing signed by employee); *Nass v. State ex rel Unity Team*, 718 N.E.2d 757, 766 (Ind. Ct. App. 1999) (holding deductions for fair share fees valid as "payments" to associations of employees under § 22-2-6-2(b)(9)). Similarly, though federal courts in Indiana have applied § 22-2-6-2 in several decisions, none have addressed the issues presented here. *See, e.g.*, *Weil v. Metal Techs., Inc.*, 305 F. Supp. 3d 948, 958–59 (S.D. Ind. 2018) (holding that, under prior version of statute, deductions for uniform rentals were invalid and deductions for "Obama Fee" were invalid because no written assignment indicating it was revocable at any time by employee), *vacated and remanded,* 925 F.3d 352 (7th Cir. 2019); *Thacker v. Halter Vegetation Mgmt., Inc.*, No. 2:13-cv-378-JMS-WGH, 2015 WL 417713, at *4 (S.D. Ind. Jan. 30, 2015) (holding, under prior version of statute, deductions for uniform rentals were invalid); *Franko v. All About Travel, Inc.*, Cause No. 2:09-cv-233-TLS, 2012 WL 2721910, at *7 (N.D. Ind. July 9, 2012) (holding that deductions for an undefined "advance" and for travel booking and cancellation fees were invalid); *Mathews v. Bronger Masonry, Inc.*, 772 F. Supp. 2d 1004, 1015 (S.D. Ind. 2011) (holding deduction was invalid where employer did not know why deduction was made).

Without the benefit of specific, relevant authority to inform its *Erie* guess, the Court turns to the Indiana Supreme Court's more general principles of statutory interpretation. "The first step in interpreting any Indiana statute is to determine

whether the legislature has spoken clearly and unambiguously on the point in question. When a statute is clear and unambiguous, [the Court] need not apply any rules of construction other than to require that words and phrases be taken in their plain, ordinary, and usual sense." *St. Vincent Hosp. & Health Care Ctr., Inc. v. Steele*, 766 N.E.2d 699, 704 (Ind. 2002) (citation omitted). "If a statute is ambiguous, however, [the Court] must ascertain the legislature's intent and interpret the statute so as to effectuate that intent. A statute is ambiguous where it is susceptible to more than one interpretation." *Elmer Buchta Trucking, Inc. v. Stanley*, 744 N.E.2d 939, 942 (Ind. 2001). In interpreting a statute, the Indiana Supreme Court seeks to "give it a practical application, to construe it so as to prevent absurdity, hardship, or injustice, and to favor public convenience." *Pabey v. Pastrick*, 816 N.E.2d 1138, 1148 (Ind. 2004); *see also Naugle v. Beech Grove City Schs.*, 864 N.E.2d 1058, 1068–69 (Ind. 2007) (taking the "practical consideration" of payroll preparation into account to interpret the term 'days' in the wage payment statute's Ten-Day Rule as business days); *Nass*, 718 N.E.2d 757 (construing § 22-2-6-2 "in such a way as to prevent absurdity and hardship and to favor public convience").

The words "at any time" are ambiguous, as the Third Circuit has observed in the context of employment agreements:

> Suppose an employer and employee enter into a contract stating that employee will work forty hours per week for $500, payable at the end of the week. The contract further states that employment is at will and employer can change employee's wages "at any time." After working a week, employee goes to pick up her pay check. Employer informs employee that it has exercised its right to change her wages "at any time," and will be paying her $300 for that week's work. Despite the seemingly

> unambiguous "at any time" language, it seems reasonable that an employee would not expect the reduction in salary to take place post-performance. Although this is not our situation, it makes clear that the words "at any time" may admit of more than one reasonable interpretation.

*In re New Valley Corp.*, 89 F.3d 143, 151 (3d Cir. 1996). The parties' competing interpretations of "at any time" here present a similar ambiguity. Heart of CarDon issued paychecks nine days after the end of the pay period and required notice of revocation ten days before payday. Thus, the issue here is whether language effectively permitting revocation at any time before the wages have been earned is consistent with the statute's requirement that wage assignments be revocable "at any time."

Indiana courts have long held that "statutes in derogation of the common law must be strictly construed." *Loparex, LLC v. MPI Release Techs., LLC*, 964 N.E.2d 806, 817 (Ind. 2012) (citing *Hinshaw v. Bd. of Comm'rs of Jay Cty.*, 611 N.E.2d 637, 639 (Ind. 1993)). That is, such statutes must "be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident." *United States v. Texas*, 507 U.S. 529, 534 (1993). Thus, Indiana courts strictly construe the Indiana Tort Claims Act, the Indiana Medical Malpractice Act, and the Indiana Worker's Compensation Act against limitations on claimants' right to bring suit. *Greater Hammond Cmty. Servs., Inc. v. Mutka*, 735 N.E.2d 780, 782 (Ind. 2000) (Tort Claims Act); *Brenner v. All Steel Carports, Inc.*, 122 N.E.3d 872, 880 (Ind. Ct. App. 2019) (Worker's Compensation Act); *G.F. v. St. Catherine Hosp., Inc.*, 124 N.E.3d 76, 84 (Ind. Ct. App. 2019) (Medical Malpractice Act).

The Indiana Supreme Court has long recognized the common-law right to contract freely, strictly construing statutes in derogation of that right. *See, e.g., Naugle*, 864 N.E.2d at 1066 ("liberty to contract on one's own terms, to decide for himself his own employment, to buy and sell, to exchange one belonging for another, are among his most valuable and cherished rights") (quoting *Republic Iron & Steel Co. v. State*, 66 N.E. 1005, 1008 (Ind. 1903)); *Trimble v. Ameritech Pub., Inc.*, 700 N.E.2d 1128, 1129 (Ind. 1998) ("Courts in Indiana have long recognized the freedom of parties to enter into contracts and have presumed that contracts represent the freely bargained agreement of the parties. We continue to believe that it is in the best interest of the public not to restrict unnecessarily persons' freedom of contract."); *Guardian Life Ins. Co. v. Barry*, 10 N.E.2d 614, 616 (Ind. 1937) ("The statute here in question contra-venes the common-law right of the company to freely contract with respect to the time in which its policy shall be contestable. Statutes in derogation of the common law are strictly construed, and, where there is doubt, they will be construed as not changing the common-law rule."); *Humphry v. City Nat'l Bank of Evansville*, 130 N.E. 273, 277 (Ind. 1921) ("And the first and second sections restrict in some measure a right which all persons enjoyed under the common law of transacting business and making con-tracts in any name they chose to adopt. Being a penal statute and in derogation of a common-law right, it must be strictly construed."). Indiana's wage assignment stat-ute is in derogation of the common-law right to contract freely. *See Cleveland, Cin-cinnati, Chi. & St. Louis Ry. Co. v. Marshall*, 105 N.E. 570, 571 (Ind. 1914) (noting

that "statutes of this character are subject to the rule of strict construction, because in derogation of common-law rights").

The predecessor to the current wage assignment statute provided, "The assignment of *future wages, to become due* to employe[e]s from persons, companies, corporations, or associations affected by this Act, is hereby prohibited[.]"  Act of Feb. 28, 1899, ch. 124, § 4, 1899 Ind. Acts 193–94 (emphasis added); *see also* Act of March 6, 1945, ch. 183, § 3, 1945 Ind. Acts 453 (repealing the 1899 act and replacing it with legislation substantially resembling IND. CODE § 22-2-6-1 *et seq.*); *Wagner v. United States*, 573 F.2d 447, 451 (7th Cir. 1978) (referring to the 1899 act as a "predecessor Indiana statute" to IND. CODE § 22-2-6-1 *et seq.*).   In rejecting a constitutional challenge to the 1899 act's ban on the assignment of future wages, the Indiana Supreme Court explained the legislature's animating policy concern:

> Where future wages may be assigned, the temptation to anticipate their payment, and to sacrifice them for an inadequate consideration, is often very great.  Such assignments would, in many cases, leave the laborer or wage–earner without present or future means of support.  By removing the strongest incentive to faithful service,—the expectation of pecuniary reward in the near future,—their effect would be alike injurious to the laborer and his employer.

*Int'l Text-Book Co. v. Weissinger*, 65 N.E. 521, 523 (Ind. 1902).  The Court concluded that the 1899 act's prohibition did "not extend to wages which have been earned, but merely suspend[ed] the right to dispose of wages by assignment until they are earned."  *Id.* at 524.

In this way, the 1899 act's scope was narrower than a 1901 act regulating the assignment of "wages, earned or unearned, due or to become due[.]"  Act of March 11,

1901, ch. 238, § 1, 1901 Ind. Acts 549. The 1899 act was likewise narrower than a 1909 act referring to "wages" without qualification, *see* Act of Feb. 27, 1909, ch. 34, § 4, 1909 Ind. Acts 76, which the Indiana Supreme Court held, "clearly manifests an intent to prohibit assignments of wages, *whether earned or to be earned*," *Marshall*, 105 N.E. at 571 (emphasis added).

In 1945, the Indiana legislature repealed and replaced the 1899 act's prohibition on assignments of future wages with a statute essentially identical to the current wage assignment statute.[4] If the legislature intended to expand the scope of the 1899 act to extend to assignments of earned wages, it needed only to adopt the language from the 1901 act and refer to "wages, earned or unearned, due or to become due." Or, if it opted for brevity, the legislature could have followed the 1909 act and referred to "wages" without qualification. Instead, the wage assignment statute provides, "Any direction hereafter given by an employee to his or her employer to make a deduction from the wages *to be earned* by said employee, after said direction is given, shall constitute an assignment of the wages of said employee." IND. CODE § 22-2-6-1(a) (emphasis added).

Thus, like its predecessor 1899 act, the current statute's scope extends only to assignments of "wages to be earned." "Undoubtedly, a basic purpose of the statute is for the protection of the wage-earner from the claims of creditors, with the option being kept open to that individual to renege at any time on his assignment *as to future wages*." *Wagner*, 573 F.2d at 452 (emphasis added); *see also* 1965 Ind. Att'y Gen. Op.

---

[4] The current statute differs chiefly in the number of permissible purposes enumerated.

No. 60, 1965 O.A.G. 317 (stating that the act "defines 'wage assignments' as any direction given by an employee to his employer to make a deduction from his wages *to be earned in the future*") (emphasis added). Accordingly, a wage assignment is revocable "at any time" within the meaning of the statute so long as it is revocable at any time before the wages are earned. Given Heart of CarDon's practice of issuing paychecks nine days after the end of each pay period, the ten-day notice provision did not impair Duvall's option to revoke the assignments "at any time" as to unearned, future wages, but only as to earned but unpaid wages, so the assignments complied with § 22-2-6-2(a)(1)(C).

Moreover, even if the notice provisions did violate § 22-2-6-2(a)(1)(C), that violation would not entitle Duvall to recover here. "Generally, a contract made in violation of a statute is void." *Harbour v. Arelco, Inc.*, 678 N.E.2d 381, 385 (Ind. 1997). Thus, a wage assignment that is not in a signed writing or is not for a permissible purpose may be altogether invalid. *See, e.g., E&L Rental Equip., Inc. v. Bresland*, 782 N.E.2d 1068, 1070 (Ind. Ct. App. 2003) (no writing and improper purpose); *Cox v. Town of Rome City*, 764 N.E.2d 242, 250 (Ind. Ct. App. 2002) (no signed writing); *Ball v. United GT Corp.*, Cause No. 2:08-cv-254-WTL-WGH, 2010 WL 680348, at *4 (S.D. Ind. Feb. 22, 2010) (no writing). "However, if a contract contains an illegal provision which can be eliminated without frustrating the basic purpose of the contract, the court will enforce the remainder of the contract." *Harbour*, 678 N.E.2d at 385; *see also Wells v. Vandalia R. Co.*, 103 N.E. 360, 362 (Ind. Ct. App. 1913) ("An assignment of future wages is separable from the other portions of an otherwise legal contract;

and, while the assignment is unenforceable, this should not prevent the enforcement of the legal obligations entered into by the same contract. Because a contract contains one illegal provision it does not necessarily follow that the entire contract is illegal and void."). As Duvall never attempted to revoke the assignments before her wages were paid (with corresponding deductions), the enforcement of the ten-day notice provisions against Duvall is not at issue here. And because the ten-day notice provisions "can be eliminated without frustrating the basic purpose[s]" of the assignments, an Indiana court would enforce the remainder of the assignments if otherwise valid.

    2.  Purpose – IND. CODE § 22-2-6-2(b)

The criminal history and uniform assignments are still valid only if they were made for a purpose authorized by § 22-2-6-2(b). Defendants contend that the criminal history deductions were made pursuant to a valid assignment for "the amount of a loan" under § 22-2-6-2(b)(7). As for the uniform deductions, Defendants argue that they were made pursuant to a valid assignment for "the amount of a loan" under § 22-2-6-2(b)(7), for the "purchase price of merchandise" under § 22-2-6-2(b)(6), or for the "purchase of uniforms" under § 22-2-6-2(b)(14).[5] Duvall responds that the criminal history deduction was not for any purpose authorized by § 22-2-6-2(b) and that the uniform deductions, though authorized by § 22-2-6-2(b)(14), exceeded five percent of Duvall's weekly disposable earnings in violation of § 22-2-6-2(d)(2).

---

[5] The statute was revised while this case was pending to allow for deductions for rental or use of uniforms, as well. The revision does not affect the matters discussed in this Entry.

Duvall argues that the criminal history deductions were not payment for a loan because there "were no loan transactions between Heart of CarDon, LLC and Duvall," (Pl.'s Reply 6), since "Heart of CarDon, LLC provided no money to Duvall . . . to let [her] pay for a criminal background check," (*id.* at 7). Defendants respond that payment directly to the borrower is not necessary to create a loan.

Duvall's argument relies on an overly narrow definition of "loan." The wage assignment statute does not define "loan." "If the legislature has not defined a word, it is afforded its plain and ordinary meaning. Courts may properly consult English dictionaries to determine the plain and ordinary meaning of words." *Naugle*, 864 N.E.2d at 1068. Dictionaries define "loan" as "something the use of which is allowed for a time, on the understanding that it shall be returned or an equivalent given." *Loan*, OXFORD ENGLISH DICTIONARY, https://www.oed.com/view/Entry/109446; *see also Loan*, MERRIAM-WEBSTER ("money lent at interest" or "something lent usually for the borrower's temporary use"), https://www.merriam-webster.com/dictionary/loan. In ordinary usage, a lender need not provide money directly to a borrower to create a loan. For example, two colleagues go out for lunch and one forgets her wallet. Assuming the colleagues agree on repayment, the one colleague may provide a "loan" to the other simply by paying the full bill; the existence of a loan does not depend on the lender handing cash to the borrower for the borrower to then pay her share to the server. Similarly, countless consumers have purchased cars with loans without ever receiving cash or check from their lender in the amount of their car loan. So, too, student loans are often paid directly to the educational institution rather than

to the student. This ordinary usage is further supported by the definition of "loan" elsewhere in Indiana law: "'Loan' includes . . . the creation of debt by the lender's payment of or agreement to pay money to the debtor *or to a third party for the account of the debtor*." IND. CODE § 24-4.5-3-106 (emphasis added); *see also id.* § 23-2.5-1-13 ("'Loan' means an agreement to advance money or property in return for the promise to make payments for the money or property."). Payment to Edge on Duvall's behalf may therefore constitute a "loan" without any direct payment to Duvall.

Duvall further argues that the criminal history deductions were not for the "[a]mount of a loan made to the employee by the employer" under § 22-2-6-2(b)(7) because any loan was not between Duvall and her employer, Heart of CarDon. (Pl.'s Reply 8.) CarDon & Associates, Inc., not Heart of CarDon, paid Edge for the criminal history check, and there are no loan transfer agreements between the CarDon entities. Here, too, Duvall's argument relies on an overly narrow definition of "loan." The two CarDon entities have an arrangement whereby CarDon & Associates, Inc. "provides administrative services and support to [the health care facilities] in areas such as accounting, payroll, human resources, marketing, and information technology." (Duvall Dep., Ex. 8, ECF No. 60-2 at 5.) That the two CarDon entities have some arrangement for the payment of Heart of CarDon's human resources expenses does not affect the existence of a loan between Heart of CarDon and Duvall. For example, two colleagues go out to lunch, and one forgets her wallet. The other colleague pays the entire bill with her credit card. Assuming the two colleagues agree on repayment, there is a loan between the colleagues to which the credit card company is not a party.

Heart of CarDon required Duvall to pay for the cost of a criminal history check in accordance with Indiana law. *See* IND. CODE § 16-28-13-6(b). Heart of CarDon could have required Duvall to pay at the time she submitted her application for employment. *See id.* Instead, Heart of CarDon and Duvall agreed that Heart of CarDon would front the cost and consider it a loan, as evidenced in the wage assignment form. (The statute requires that the loan be "evidenced by a written instrument," not evidenced by a *separate* written instrument.) Some arrangement between Heart of CarDon and CarDon & Associates, Inc. resulted in payment to Edge for Duvall's criminal history check. This fits the ordinary meaning of loan: Duvall was allowed the immediate use of the criminal history check (*i.e.*, she began her employment immediately without paying for the criminal history check) on the understanding that she would later give the equivalent (*i.e.*, the cost of the criminal history check). *See Loan*, OXFORD ENGLISH DICTIONARY, https://www.oed.com/view/Entry/109446.

Duvall argues that the deduction was nevertheless invalid because the form called for a "limited criminal history," which can be obtained from the Indiana State Police for fifteen dollars, while Heart of CarDon deducted $27.50. (Pl.'s Br. 29–30.) The uncontroverted evidence shows that CarDon & Associates, Inc. did, in fact, pay $27.50 to Edge for the criminal history check, which included Indiana data as well as data from federal agencies and other states, and that Duvall expressly agreed to pay that amount. That the limited criminal history may have been available for less from another source does not render the deduction invalid. The only limit on deduction

amounts under § 22-2-6-2(b)(7) is that they cannot exceed 25 percent of the employee's disposable weekly earnings or the amount by which the employee's disposable weekly earnings exceeds 30 times the federal minimum hourly wage. *See* IND. CODE § 22-2-6-4(c)(1). Other subsections of § 22-2-6-2(b) imposing limits on deduction amounts limit them to "an amount not to exceed the direct cost paid by an employer to an external vendor for those items." *See* IND. CODE § 22-2-6-2(b)(14)-(15). Nowhere is there a requirement that employers comparison shop for the external vendor offering those items at the lowest price.

Finally, Duvall argues that the criminal history assignment is invalid because the wage assignment form does not specifically state that the deductions are "subject to the amount limits set forth in section 4(c) of this chapter." (Pl.'s Reply 9.) The law does not require that the assignment or written instrument include the words, "subject to the amount limits set forth in section 4(c) of this chapter." It merely provides that the deductions *are* subject to those amount limits (and, by extension, that deductions in excess of those limits are invalid). Duvall does not contend that the two deductions for $13.75 each actually violated § 22-2-6-4(c) by exceeding 25 percent of her disposable weekly earnings or the amount by which her disposable weekly earnings exceeded 30 times the federal minimum hourly wage.

Accordingly, the criminal history deductions were made pursuant to a valid wage assignment "made for the purpose of paying" the "[a]mount of a loan made to the employee by the employer and evidenced by a written instrument executed by the employee" under § 22-2-6-2(b)(7), and Defendants are entitled to summary judgment

on Duvall's state-law claim arising from the criminal history deductions. Because the criminal history deductions were made pursuant to a valid wage assignment, Defendants are likewise entitled to summary judgment on Duvall's FLSA overtime claim arising from the criminal history deductions.

Next, Duvall alleges that the uniform deductions exceeded the amount limit for uniform deductions set forth in § 22-2-6-2(d)(2). Defendants respond that the deductions were not subject to those limits because they were for a "loan" under § 22-2-6-2(b)(7) or for the "[p]urchase price of merchandise" under § 22-2-6-2(b)(6). Considered in isolation, the deductions for uniform purchases here might fairly be characterized as payments for the cost of merchandise or the amount of a loan. But the statute's more general provisions for merchandise and loans yield to its specific provision for deductions for the purchase of uniforms. *Robinson v. Wroblewski*, 704 N.E.2d 467, 475 (Ind. 1998) ("the specific provision takes priority over the general provision"). Deductions for uniforms under § 22-2-6-2(b)(14) may not exceed five percent of the employee's weekly disposable earnings. Duvall is entitled to summary judgment on the uniform deduction claims because the uniform deductions exceeded the amount limit in § 22-2-6-2(d)(2).

### B. Purchasing Power

Duvall contends that no valid wage assignment authorized the deduction of $31.82 from her paycheck for payment to Purchasing Power for her installment-contract purchase of a personal computer. First, Duvall argues that Heart of CarDon "simply did not enter into any wage assignment agreement with Duvall to cover deductions for

payments" to Purchasing Power. (Pl.'s Br. 33.) Duvall contends that her agreement with Purchasing Power and Purchasing Power's agreement with Heart of CarDon do not amount to a wage assignment because "a wage assignment had to be a direction from Duvall to Heart of CarDon, LLC," and Duvall's "promise or intention to enter into a future wage assignment communicated to Purchasing Power is not a wage assignment." (Pl.'s Br. 35.)

The wage assignment statute provides that "[a]ny direction given by an employee to an employer to make a deduction from the wages to be earned by said employee . . . shall constitute an assignment of the wages of said employee." IND. CODE § 22-2-6-1(a). Duvall's contract with Purchasing Power provides, "You voluntarily authorize and direct your employer to take payroll deductions from your paychecks . . . ." (Duvall Dep., Ex. 75.) The wage assignment statute's definition encompasses "any" such direction; it does not require that the employee's "direction" be given directly to the employer by the employee. If wage assignment agreements between employees and assignees other than their employers were not contemplated by the statute, then it is difficult to make any sense of the statute's authorization of assignments to "a hospital service or a surgical or medical expense plan," to "any credit union, nonprofit organizations, or associations of employees," to "any person or organization regulated under the [UCCC]," or for premiums on insurance policies purchased by the employee. *See* IND. CODE § 22-2-6-2(b)(8)–(11). Duvall's direction to her employer to take payroll deductions, contained in her Purchasing Power agreement, constitutes a wage assignment under § 22-2-6-1(a).

Duvall further argues that a single writing must satisfy all the requirements of the wage assignment statute. (Pl.'s Br. 36.) An assignment is a type of contract. 6A C.J.S. *Assignments* § 1 ("An assignment does not differ in its essential elements from any other contract.") "A valid written contract need not be in a single self-contained document; it may consist of multiple documents so long as the necessary elements for contract formation exist." *Wildwood Indus., Inc. v. Genuine Mach. Design, Inc.*, 587 F. Supp. 2d 1035, 1046–47 (N.D. Ind. 2008) (citing *Noble Roman's, Inc. v. Ward*, 760 N.E.2d 1132, 1138 (Ind. Ct. App. 2002), *Johnson v. Sprague*, 614 N.E.2d 585, 590 (Ind. Ct. App. 1993) and 17 C.J.S. *Contracts* § 671). The statute requires that the assignment be "agreed to in writing by the employer." IND. CODE § 22-2-6-2(a)(1)(D). It does not require that the assignment and the employer's agreement be contained in the same document. In its agreement with Purchasing Power, Heart of CarDon agreed, in writing, "to honor and administer all requests from Employees ('Participant') for periodic payroll deductions for the payment of purchases as specified by Participant, whether the request comes from Employee directly or through a designated administrator/agent." (Iskander Dep. Vol. II, Ex. 73, ECF No. 60-10 at 13.) Between the two documents—Duvall's and Heart of CarDon's agreements with Purchasing Power—the requirements of § 22-2-6-2(a)(1) are satisfied.

Duvall next argues that no executed copy of the assignment was delivered to Heart of CarDon within ten days after its execution, and therefore the deduction violated § 22-2-6-2(a)(2). (Pl.'s Br. 37.) As evidence, Duvall points to a Heart of CarDon employee's email, sent several months after Duvall's agreement, asking Purchasing

Power to send a copy of the signed agreement. Defendants respond that the purposes of § 22-2-6-2(a)(2) were satisfied because Heart of CarDon received notice of the material terms of the assignment and deducted the sum called for by the assignment.

Neither party cites any case applying § 22-2-6-2(a)(2), nor has the Court found any such case, so another *Erie* guess is necessary. At issue, first, is whether substantial compliance satisfies § 22-2-6-2(a), despite its provision that an assignment is "valid only if" the requirements are met. No Indiana court appears to have decided whether substantial compliance satisfies the statute. In the absence of such precedent, Indiana courts often turn to decisions construing analogous statutes. *See, e.g.*, *In re Mandate of Funds*, 929 N.E.2d 703, 718 (Ind. 2010) (turning to the Indiana Supreme Court's own interpretation of "similar statutory language"); *I.B. v. Ind. Dep't of Child Servs.*, 933 N.E.2d 1264, 1267 (Ind. 2010) (turning to decisions of "[o]ther jurisdictions with similar statutory language").

When the Indiana legislature adopted the language of § 22-2-6-2(a) in 1945, the Indiana Supreme Court had held that a statute with similar language, IND. CODE § 32-21-1-10 ("A contract . . . is not valid unless . . . ."), was satisfied by substantial compliance. *See Provident Trust Co. v. Darrough*, 78 N.E. 1030, 1032 (Ind. 1906) ("In an action for commissions against the owner of real estate sold, a substantial compliance with the terms of the statute will be required. The operation of the statute will not be extended further than necessary to make its spirit and purpose effective."). That interpretation persists. *See, e.g.*, *First Fed. Sav. Bank of Ind. v. Galvin*, 616 N.E. 2d 1048, 1056 (Ind. Ct. App. 1993) ("There is no writing signed by First Federal

agreeing to pay a commission to Galvin. This, however, does not prevent us from concluding that the agreement to pay Galvin a commission is enforceable[.]"); *Byrum v. Bookout Props., Inc.*, 889 N.E. 2d 926 (Ind. Ct. App. 2008) (unpub.) ("In an action for commissions against the owner of real estate sold, a substantial compliance with the terms of the statute will be required.") (quoting *Price v. Walker*, 88 N.E. 78, 79 (Ind. Ct. App. 1909)).

More recently, the Indiana Supreme Court has affirmed that the "eminently practical" doctrine of *de minimis non curat lex* ("the courts' way of saying, 'So what?'") "is part of the established background of legal principles against which all enactments are adopted, and which all enactments are deemed to accept." *D & M Healthcare, Inc. v. Kernan*, 800 N.E.2d 898, 901 (Ind. 2003) (quoting *Wis. Dep't of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 231 (1992)). In *Kernan*, the plaintiffs argued that the governor's veto was ineffective because it was delivered six months earlier than the Indiana Constitution required. *Id.* at 898. In rejecting that claim, the Court faulted the plaintiffs for ignoring "the many practical and sound cases from [the Indiana Supreme Court] and others recognizing that immaterial variances from prescribed procedures have no legal fallout." *Id.* at 903 (collecting cases).

Thus, notwithstanding the statute's direction that a wage assignment is "valid only if" the various requirements are met, Indiana courts would likely find the statute's requirements satisfied by substantial compliance. "Substantial compliance with a statutory mandate is sufficient if the act of compliance accomplishes the essential purpose of the statute." *NOW!, Inc. v. Indiana-American Water Co.*, 117 N.E.3d 647,

659 (Ind. Ct. App. 2018) (holding that city substantially complied with statute requiring information in a single document by making the information available in multiple documents); *see also Kernan*, 800 N.E.2d at 902 ("Here we think it obvious . . . that the purpose of the language at issue here is to assure that the legislature have the earliest possible opportunity to consider, and, if it so chooses, to override a veto. The Governor's veto message here fully met that objective, and no one has suggested any nefarious consequence arising from the procedure followed by the Governor in making clear his rejection of the bill."); *Delaware Cty. v. Powell*, 393 N.E.2d 190, 192 (Ind. 1979) ("When the purposes of the statute are fully satisfied, it is clear that the result is substantial compliance with the statute."). It remains to determine the purpose of § 22-2-6-2(a)(2) and whether that purpose was accomplished.

The purpose of § 22-2-6-2(a)(2) appears to depend on whether, for the assignment in question, the employer is both the debtor and the assignee or merely the debtor. Where the employer is both debtor and assignee, the statute's delivery requirement simply codifies the common-law definition of "execution" of an assignment. The assignment is not "executed" until the property or deed of assignment has been delivered. *See Smith v. James*, 30 N.E. 902, 903 (Ind. 1892) ("If we can justly say that the trial court employed the term 'executed the deed' in its ordinary legal signification, then we can adjudge that the finding shows a delivery, for the term implies a delivery."); *Nicholson v. Combs*, 90 Ind. 515, 516 (Ind. 1883) ("The word executed implies both a signing and a delivery, and a signed note duly delivered is a complete contract.

In a legal sense, the word 'execute' includes delivery and implies a complete contract."); 21 C.J.S. *Creditor & Debtor* § 29 ("To make the execution of an assignment complete, and to make the instrument finally effective and operative to pass title, there must be a delivery of the deed of assignment to someone."). Thus, a wage assignment signed by the employee but left on her bureau is not executed.

But here, Purchasing Power is the assignee, not Heart of CarDon. Heart of CarDon is just the debtor. In such instances, the purpose of the delivery requirement is to provide notice of the assignment so that the employer may remit payment to the assignee. *See* 6A C.J.S. *Assignments* § 81 ("Generally, notice is necessary only to charge the debtor with the duty of payment to the assignee."); *id.* § 82 ("No particular form of notice of an assignment is necessary, but it must be sufficient to inform the debtor that the assignee is owner of the assigned claim."); Act of Feb. 27, 1909, ch. 34, § 5, 1909 Ind. Acts 78 ("No assignment of wages shall be valid or enforceable unless notice in writing of the same, accompanied by a copy of the assignment, shall be given to the employer *or debtor* within ten (10) days from the date of its execution.").

Such purpose precludes Duvall from recovering for violation of § 22-2-6-2(a)(2) for two reasons. First, whatever information the electronic notice of the assignment to Heart of CarDon contained, it was sufficient for Heart of CarDon to make the deduction called for in the assignment and to remit payment to Purchasing Power in the correct amount. *See Kernan*, 800 N.E.2d at 902 ("Here we think it obvious . . . that the purpose of the language at issue here is to assure that the legislature have the earliest possible opportunity to consider, and, if it so chooses, to override a veto. The

Governor's veto message here fully met that objective, and no one has suggested any nefarious consequence arising from the procedure followed by the Governor in making clear his rejection of the bill."). Any variance from § 22-2-6-2(a) was immaterial and has "no legal fallout" under Indiana law. *See id.* at 903.

Second, the notice requirement is not a protection for the assignor (here, Duvall); rather, it protects the debtor against claims by the assignee. *See* 6 Am. Jur. 2d *Assignments* § 107 ("The purpose of the notice requirement for an assignment . . . is protection of an assignee against payments made in error by a . . . debtor to an assignor, as well as protection of a debtor against erroneous or duplicative payment."); *id.* § 104 ("a debtor, in order to be charged with a duty to pay a debt to an assignee, must first have actual notice of the assignment"); *id.* § 119 ("the defenses that an account-debtor can assert against an assignee include the failure to provide adequate notice of the assignment"); 3 Ind. Law Encyc. § 15 ("the assignee who gives no notice to the debtor may suffer any loss occasioned by a good faith payment by the debtor to another claimant"); 29 Williston on Contracts § 74:56 (4th ed.) (the debtor "should be given notice of an assignment in order that the assignee's rights will be more fully protected as against the [debtor], although . . . as between the [debtor] and the assignor, notice is generally unnecessary."). As in *Provident Trust Co.*, where the provision protected the owner of real estate, who was not party to the action, any violation of § 22-2-6-2(a)(2) here does not entitle Duvall to recover. 78 N.E. at 1032 ("The owner of real estate is not involved in this controversy and the contract sued upon is not tainted with illegality unless wholly condemned by the statute quoted. We can

conceive of no reason why such a contract in writing should be outlawed by legislative fiat, and in our opinion the Legislature did not intend by this enactment to provide a way for one party to repudiate his covenants in writing after receiving the stipulated consideration from the other."); *see also Beneficial Fin. Co. v. Wegmiller Bender Lumber Co.*, 402 N.E.2d 41, 46 (Ind. Ct. App. 1980) ("[T]he statutory scheme is designed to insure at least one of the record title holders of the property will be mailed a copy of the lien claimant's notice. . . . [A]bsent a showing by Cheryl Myers that she was somehow prejudiced by Wegmiller's failure to include her name in the notice filed with the recorder, the lien will not be defeated.").

Duvall further argues that Purchasing Power is a "wage broker" within the meaning of Indiana's wage broker statute, IND. CODE § 22-2-7-1(a) and therefore any assignment to Purchasing Power was invalid under § 22-2-7-2. (Pl.'s Br. 38.) The wage broker statute's definition encompasses "Any person, company, corporation, limited liability company, or association loaning money directly or indirectly to any employee or wage earner, except the employer of the employee, upon the security of or in consideration of any assignment of the wages . . . ." IND. CODE § 22-2-7-1(a).[6] But the wage assignment statute expressly allows wage assignments for "[p]ayment to any

---

[6] The wage broker statute was enacted long before the wage assignment statute, *see* Act of Feb. 27, 1909, ch. 34, §§ 1–2, 1909 Ind. Acts 76–77, and it is far from clear how the two fit together. By requiring that wage assignments be revocable at any time, the wage assignment statute effectively only allows "wage assignments" that are not really assignments. *See* 1943 Ind. Att'y Gen. Op. 128 ("an agreement which reserves to the original owner a right of revocation is not an assignment"); 6A C.J.S. *Assignments* § 105 ("An assignment passes all the assignor's title and interest to the assignee and divests the assignor of all right of control over subject matter of the assignment."). It is not clear whether a wage assignment, revocable at any time as required by the wage assignment statute, could be given as "security" or "consideration" for a loan within the meaning of the wage broker statute. But the parties have not briefed the issue, and the wage broker statute does not apply to the transaction at issue here for unrelated reasons.

person or organization regulated under the Uniform Consumer Credit Code . . . for deposit or credit to the employee's account." IND. CODE § 22-2-6-2(b)(10). An install-ment sale like the transaction here is a "consumer credit sale" under the UCCC. *See* IND. CODE § 24-4.5-1-301.5(8); *id.* §§ 24-4.5-6-201 & 202 (requiring registration by persons making consumer credit sales in Indiana). The UCCC regulates such sales and "does not prohibit an employee from authorizing deductions from his earnings if the authorization is revocable and otherwise permitted by law." IND. CODE § 24-4.5-2-410. As with the uniform deductions discussed above, even if Purchasing Power's transaction with Duvall could arguably be considered "loaning money . . . indirectly" within the terms of the wage broker statute, that broad language yields to the more specific provisions authorizing deductions for payment to UCCC-regulated entities.

Accordingly, Heart of CarDon is entitled to summary judgment on Duvall's claim arising from the Purchasing Power deduction.

### C. Claims Against Defendant Dr. Stephen Moore

Dr. Moore moves for summary judgment on all claims against him, contending that he was not Duvall's "employer" within the meaning of Indiana's wage payment statute or the FLSA. Duvall responds that Dr. Moore's authority as CEO and his personal involvement in various aspects of Heart of CarDon's operations preclude summary judgment on the state-law claims and entitle Duvall to summary judgment on the FLSA claims. (Pl.'s Br. 43–52.)

#### 1. Wage Payment Statute

As Chief Judge Magnus-Stinson observed in *Poff v. Quick Pick, LLC*, No. 2:15-cv-405, 2018 WL 6061569, at *3 (S.D. Ind. Nov. 20, 2018), Indiana's wage payment statute does not define "employer," but merely lists the types of entities that may be liable for violating the statute. *See* IND. CODE § 22-2-5-2. Lacking statutory guidance, Indiana courts turn to the common-law definitions of employer and employee to apply the wage payment statute. *See Mortg. Consultants, Inc. v. Mahaney*, 655 N.E.2d 493, 495 (Ind. 1995) ("Since IND. CODE § 22-2-5 does not suggest a different meaning, we interpret the statutory term 'employee' in accord with the common-law conception of employees"); *Black v. Emp. Sols., Inc.*, 725 N.E.2d 138, 141 (Ind. Ct. App. 2000) ("Because the Wage Payment Statute does not suggest another meaning, we interpret the statutory term 'employer' under the common law."). In most cases, the issue is whether the worker is an employee or an independent contractor, not whether the employer's individual owners or officers are also employers. The factors considered in determining whether an employer-employee relationship exists include (1) the intent to create an employment relationship and (2) the control over employees, as evidenced by the right to discharge, mode of payment, supply of tools or equipment, belief of the parties in the existence of an employer-employee relationship, control over the means used in the results reached, length of employment, and establishment of the work boundaries. *Black*, 725 N.E.2d at 142–143.

Duvall contends that "[r]eference to common law to interpret the statute would be legally incorrect" because the *Poff* case "had nothing to do with the definition of an employer under the Indiana Wage Payment Statute" and that "[i]f defendants had

read carefully, they would have noted that the *Poff* decision concerned the definition of an employer found in an entirely different statute[.]" (Pl.'s Br. 51.) In fact, the definition at issue in *Poff* was, like the wage payment statute's definition, a list of types of entities. And *Poff* relied on *Mortgage Consultants* and *Black*, Indiana cases that used the common-law definitions of "employer" and "employee" to interpret the terms as used in the wage payment statute.

*Erie* and its progeny require the Court to look to the Indiana courts, and the Indiana courts apply the common-law definitions of "employer" and "employee" in cases under the wage payment statute. Though it is not entirely clear how an Indiana court might adapt the common-law factors to the question here, the evidence overwhelmingly shows that Heart of CarDon, not Dr. Moore, was Duvall's employer within the common-law meaning of the term. In *Poff*, the Court held that the individual defendant was not the plaintiff's employer because there was no evidence that the plaintiff and the individual defendant intended to create an employment relationship between themselves, and although the individual defendant had ultimate power to hire and fire, it was another employee who actually exercised that power with respect to the plaintiff and who actually managed day-to-day operation. *Poff*, 2018 WL 6061569 at *4. So too here: Duvall and Dr. Moore did not intend to create an employment relationship between themselves, as opposed to between Duvall and Heart of CarDon, and employees several steps removed from Dr. Moore were responsible for Duvall's hiring and for the day-to-day operations as they related to Duvall's employment.

The conclusion would be the same even if the Court were to accept Duvall's invitation to look instead to the definition in the wage claims statute, IND. CODE § 22-2-9-1(a). The wage claims statute's definition consists of a list of types of entities, followed by "*employing* any person in this state." IND. CODE § 22-2-9-1(a) (emphasis added). The definition uses the term being defined and provides no guidance. Duvall cites a single case applying the wage claims statute's definition to find an individual defendant liable, *Feagans v. Carnahan*, No. 2:15-cv-222-JMS-DKL, 2016 WL 7210944 (S.D. Ind. Dec. 13, 2016). The factors considered by the *Feagans* court are not set forth in the analysis, but the only relevant similarity between this case and *Feagans* is that both plaintiffs sued an individual. (Duvall—rather tellingly—makes no attempt to compare the cases beyond the fact that individual liability was at issue.) In *Feagans*, the plaintiff worked for the county prosecutor's office and the individual defendant was the elected prosecutor. The individual defendant personally implemented staffing changes, including reassigning the plaintiff to office receptionist, discussing the plaintiff's retirement plans, and ultimately terminating the plaintiff. The individual defendant was also aware of the hours the plaintiff worked. The evidence here is that Dr. Moore tried to visit each facility twice each year. Though, by virtue of his position, he had the ultimate power to hire and fire, he was not involved in Duvall's hiring or her departure, he did not set her work schedule, and he did not determine her rate of pay. There is no evidence that he exercised any actual control over payroll procedures, including the deductions at issue in Duvall's state-law

claims.  In short, apart from the fact that Duvall, too, has sued an individual, there are no relevant similarities to *Feagans*.

Accordingly, Dr. Moore is entitled to summary judgment on Duvall's state-law claims.

2.  FLSA

The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ."  29 U.S.C. § 203(d).  The Supreme Court has remarked upon the statute's "striking breadth."  *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992).  "The word 'employer' is defined broadly enough in the Fair Labor Standards Act . . . to permit naming another employee rather than the employer as defendant, provided the defendant had supervisory authority over the complaining defendant and was responsible in whole or part for the alleged violation."  *Riordan v. Kempiners*, 831 F.2d 690, 694 (7th Cir. 1987).  "The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages."  *Roberts v. Apple Sauce, Inc.*, 945 F. Supp. 2d 995, 1005 (N.D. Ind. 2013) (quoting *Solis v. Int'l Detective & Protective Serv., Ltd.*, 819 F. Supp. 2d 740, 748 (N.D. Ill. 2011)).

Courts do not determine individual liability under the FLSA in mid-air, without reference to the specific FLSA violations alleged; taking their cue from the FLSA definition's requirement that an "employer" be "acting . . . in relation to an employee," courts probe for links between the individual's "operational control" and the FLSA-

violating conduct or policy. In *Dole v. Simpson*, 784 F. Supp. 538 (S.D. Ind. 1991), for instance, the FLSA violation at issue was the corporation's failure to pay wages when it ran out of funds. Judge Tinder examined the individual defendant's operational control over the corporation with respect to the decision to continue operations without adequate funding. *Id.* at 546 ("The FLSA violations here occurred, if at all, because Simpson turned off the financial tap flowing from his personal resources to the corporation and its employees after it floundered during April and May. . . . This situation is distinct from cases where functioning corporations pay their employees less than the statutory minimum. In those cases, it is logical to consider how much control certain individuals had over employment decisions related to wages and hours. . . . In this case, the event that caused the alleged FLSA violations was not establishment of an unlawfully low wage scale. These employees simply were not paid."). Other cases similarly look to the causal relationship between the individual's operational control and the FLSA violations. *See, e.g., Maravilla v. Rosas Bros. Constr., Inc.*, 401 F. Supp. 3d 886, 902 (N.D. Cal. 2019) (holding co-owners were individually liable as employers where they instructed the plaintiff to record his hours inaccurately); *Arteaga v. Lynch*, No. 10 C 1444, 2012 WL 3879899 (N.D. Ill. Sept. 6, 2012) (granting summary judgment for plaintiff where the individual defendant "knew when the corporate account held insufficient funds to cover payroll and made the determination to withhold paychecks until a later date"); *Villareal v. El Chile, Inc.*, 776 F. Supp. 2d 778, 787 (N.D. Ill. 2011) ("To hold [the individual defendants] liable as statutory employers at this stage in the litigation, however, the Court would have

to weigh conflicting testimony regarding, among other things, the extent to which they had control of the managers of the corporate defendants, the employees who allege their rights were violated and the corporate decisions not to pay employees overtime wages when they worked more than 40 hours a week.").

In short, "it is generally control over the decisions which may cause a violation of the FLSA which equates to a duty and potential liability as an employer." *White v. Classic Dining Acquisition Corp.*, No. 1:11-cv-712-JMS-MJD, 2012 WL 1252589, at *3 (April 13, 2012) (citing *Villareal*, 776 F. Supp. 2d at 784); *see also Davis v. B & S, Inc.*, 38 F. Supp. 2d 707, 715 (N.D. Ind. 1998) ("The ultimate question facing the Court in the 'economic reality' inquiry is whether the individual had control over the alleged FLSA violation."). Duvall's allegation that Heart of CarDon failed to pay her for off-the-clock work is the only remaining FLSA claim, so the issue is whether Dr. Moore had "operational control" in relation to Duvall's off-the-clock work.

Duvall relies principally on a Second Circuit case, *Irizarry v. Catsimatidis*, 722 F.3d 99 (2d Cir. 2013), contending that it has "virtually identical facts" to this case. (Pl.'s Br. 44.) The parties' briefs focus exclusively on the degree of the *Irizarry* defendant's "operational control" of the company generally. But *Irizarry* cannot be understood without an examination of the FLSA-violating conduct at issue. The plaintiffs in *Irizarry* were co-managers and department managers at Gristede's supermarkets. *Torres v. Gristede's Operating Corp.*, No. 04 Civ. 3316, 2006 WL 2719730, at *2 (S.D.N.Y. Sept. 29, 2006). (Thus, the reference to the individual defendant's interac-

tions with "managers" in *Irizarry* is not akin to Dr. Moore's interactions with his subordinates in this case—the "managers" in *Irizarry* were the plaintiff class.) The individual defendant, Catsimatidis, was the chairman, president, and CEO of Gristede's. *Irizarry*, 722 F.3d at 102. The plaintiffs alleged claims for unpaid overtime. First, the plaintiffs alleged that the defendants misclassified the plaintiffs as exempt, salaried employees but systematically docked their pay if they worked fewer than 50 hours. *Torres*, 2006 WL at *2, 10. The policy's scope was expansive: the defendants docked pay from 85% of co-managers at 96% of stores in 97% of workweeks. *Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, 459 (S.D.N.Y. 2008) ("*Torres II*"). Second, the plaintiffs alleged that the company's policy was not to credit department managers with more than their 40 scheduled hours per week unless the department manager had prior authorization. The company's "central management" deleted hours from employees' time records to eliminate overtime, and upper management "exerted significant pressure on" store managers to meet payroll budgets, so store managers also deleted hours from employees' time records. 2006 WL 2719730 at *5. Third, the plaintiffs alleged that they worked off-the-clock with their supervisors' awareness and at their supervisors' direction. *Id.* at * 5. The district court concluded that "instances of impermissible deductions were not confined to a handful of stores and cannot be explained by temporary phenomena like miscalculations or computer payroll problems." *Torres II*, 628 F. Supp. 2d at 459.

The FLSA-violating conduct at issue in *Irizarry* thus involved "central management" falsifying time cards, "upper management" exerting "significant pressure," and

widespread, systematic deductions of salaried workers' pay. The widespread, systematic nature of the violations and the complicity and involvement of "upper" and "central" management provided the link between the individual defendant's "operational control" and the violations. Thus, the Second Circuit held that, though the facts made for a "close case," *Irizarry*, 722 F.3d at 116, Catsimatidis was a statutory employer by virtue of his "active exercise of overall control over the company, his ultimate responsibility for the plaintiffs' wages, his supervision of managerial employees, and his actions in individual stores," *id.* at 117.

Unlike the plaintiffs in *Irizarry*, Duvall cites no evidence to suggest that the off-the-clock work was systematic or pervasive throughout Heart of CarDon, nor does she cite evidence that she performed the off-the-clock work at upper-management's direction, with upper-management's knowledge, or as a result of upper-management's influence. Without such evidence, there is no connection between Dr. Moore's general authority as CEO and the alleged FLSA violations.

A more recent Second Circuit case, *Tapia v. BLCH 3rd Ave. LLC*, 906 F.3d 58 (2d Cir. 2018), is more helpful. There, to determine whether the alleged employer had "control over [the] company's actual 'operations' in a manner that relates to [the] plaintiff's employment," the Second Circuit considered four factors: whether "the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined rate and method of payment, and (4) maintained employment records." *Id.* at 61. The

Second Circuit held that the district court did not err in finding the individual defendant was not an "employer" where the individual defendant did not hire or discipline the plaintiffs, and someone else hired the floor manager; the individual defendant visited the restaurant, tasted the food, and directed employees to clean but did not control work schedules or other personnel decisions and was not aware of the plaintiffs' hours or conditions of employment; the individual defendant did not determine employees' rates and methods of payment or sign paychecks; and the individual defendant reviewed payroll records but did not maintain them. *Id.* at 61–62.

Here, Dr. Moore had the hypothetical power to hire and fire Duvall, but he did not hire her, and she was not fired. Indeed, Dr. Moore has never exercised that power with respect to employees so far down the chain of command; he has only hired his four direct reports. (Moore Dep. 42:22–43:5.) Those direct reports do not need Dr. Moore's approval to terminate an employee. (Moore Dep. 38:18–39:4.) Dr. Moore does not set work schedules or approve overtime hours. (Iskander Dep. I 108:4–109:2.) Dr. Moore never provided Duvall with any direction and never asked her to work off the clock. (Duvall Dep. 211:24–213:1.) There is no evidence that Dr. Moore was aware of Duvall's hours. Dr. Moore has never signed any payroll checks for employee wages. (Moore Dep. 63:10–15.) Thus, as in *Tapia*, only one of the four factors is even partially satisfied. *Tapia*, 906 F.3d at 61.

Duvall further argues that *someone* must be individually liable, and Dr. Moore is the only candidate. (Pl.'s Br. 49.) There is an undisputed employer here: Heart of CarDon. The FLSA's definition of "employer" does not entail that there must be an

individual liable for every FLSA violation, and Duvall cites no authority for the proposition.

Accordingly, Dr. Moore is entitled to summary judgment on Duvall's FLSA claims.

## IV. Conclusion

For the reasons explained above, Duvall's motion for partial summary judgment (ECF No. 62) is **granted in part**, and Duvall is entitled to judgment in her favor against Heart of CarDon on her claims arising from the uniform deductions to the extent those deductions exceeded five percent of her weekly disposable wages. Duvall's motion is otherwise **denied**. Heart of CarDon's motion for partial summary judgment (ECF No. 59) is **granted in part**, and Duvall's claims arising from the criminal history check deduction and the Purchasing Power deduction are **dismissed** on the merits with prejudice. Heart of CarDon's motion is otherwise **denied**. Dr. Moore's motion for summary judgment (ECF No. 59) is **granted**, and Duvall's claims against Dr. Moore are **dismissed** on the merits with prejudice. Because this order "adjudicates fewer than all the claims" in this action, final judgment will not issue at this time. Fed. R. Civ. P. 54(b).

**SO ORDERED.**

Date: 3/17/2020

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Gregory W. Guevara
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
gguevara@boselaw.com

Robert J. Hunt
LAW OFFICE OF ROBERT J. HUNT, LLC
rob@indianawagelaw.com

Robert Peter Kondras, Jr.
HASSLER KONDRAS MILLER LLP
kondras@hkmlawfirm.com

Tyler John Moorhead
BOSE MCKINNEY & EVANS LLP
tmoorhead@boselaw.com

David L. Swider
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
dswider@boselaw.com